UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| BRENDA BAILLARGEON<br>  Plaintiff,<br><br>v.<br><br>DRUG ENFORCEMENT ADMINISTRATION,<br>SUSAN D. ASHCRAFT, in her individual<br>capacity, THE UNITED STATES OF AMERICA,<br>JOHN DOE II, in his individual capacity,<br>and JOHN DOE III, in his individual<br>capacity,<br>  Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CA No: 07-271M |

## MEMORANDUM AND ORDER

JOHN J. McCONNELL, JR., United States District Judge.

This matter is before the Court on the parties' cross motions for summary judgment. Plaintiff, Brenda Baillargeon, has moved for partial summary judgment on liability only, and Defendant, United States Drug Enforcement Administration ("DEA"), has moved for summary judgment on Count I of the Amended Complaint, the only count remaining after the earlier resolution of motions to dismiss brought by the DEA and other defendants. Plaintiff initiated this lawsuit with a seven-count complaint, alleging that the DEA and its employees and agents violated her constitutional rights, as well as federal and state laws, when their revocation of her security clearance resulted in the termination of her employment. The DEA's motion to dismiss resulted in the dismissal of five counts and the narrowing of the two remaining counts to one

legal theory, pursuant to Fed. R. Civ. P. 12(b)(6).[1] In addition, claims against the two John Does were dismissed because the Court determined it lacked sufficient *in personam* jurisdiction over them, based on Fed. R. Civ. P. 12(b)(2). A second motion to dismiss brought by Defendant Susan Ashcraft, DEA's Chief of Operations Management of the Asset Forfeiture Section, resulted in the dismissal of Ashcraft from the lawsuit based on her qualified immunity as a government official.[2] After an extensive review of the present motions and the more fully-developed record, the Court determines that it should grant summary judgment in favor of the DEA on the remaining count for the reasons discussed below. This order will now end this four-year old case.

## STANDARD OF REVIEW

When ruling on a motion for summary judgment, the court must look to the record and view all the facts and inferences therefrom in the light most favorable to the nonmoving party. *Cont'l Cas. Co. v. Canadian Univ. Ins. Co.*, 924 F.2d 370, 373 (1st Cir. 1991). Once this is done, Rule 56(c) requires that summary judgment be granted if there is no issue as to any material fact and the moving party is entitled to judgment as a matter of law. A material fact is one affecting the lawsuit's outcome. *URI Cogeneration Partners, L.P. v. Bd. of Governors for Higher Educ.*, 915 F.Supp. 1267, 1279 (D.R.I. 1996).

The analysis required for cross motions for summary judgment is the same. *Scottsdale Ins. Co. v. Torres*, 561 F.3d 74, 77 (1st Cir. 2009). In evaluating cross-motions, the court must determine whether or not either party is entitled to judgment as a matter of law based upon the

---

[1] The Court's first decision may be found under the same caption at 638 F.Supp.2d 235 (D.R.I. 2009).

[2] The second decision may be found at 707 F.Supp.2d 305 (D.R.I. 2010).

undisputed facts. Id.

BACKGROUND

In October 1990, Plaintiff was hired by a private third-party contractor as an at-will employee to perform data entry at DEA's regional office in Warwick, Rhode Island. For this job, Plaintiff was required to and did obtain DEA-sensitive clearance, which enabled her to review unclassified files concerning law enforcement and afforded her access to the DEA office. This DEA-sensitive clearance was routinely referred to by the parties as a "security clearance."[3]

In June 1991, Plaintiff was promoted by the third-party contractor to the position of Asset Forfeiture Specialist in the DEA's Asset Forfeiture Program. In this job, Plaintiff worked with federal agents to locate and seize assets of targeted criminals. For the next several years, Plaintiff remained in this capacity, even as the DEA changed its private contractors, with only one contractor at a time working in the area of asset forfeiture.

In October 2004, Plaintiff became a "Records Examiner/Analyst" for the current contractor, Forfeiture Support Associates ("FSA"). According to Defendant, the Records Examiner/Analyst position is equivalent to the Department of Labor's position of Paralegal/Legal Assistant II. Although the parties have submitted a chart from FSA's contract that appears to support this allegation, Plaintiff disputes that the positions are equivalent. In addition, Defendant characterizes the Records Examiner/Analyst position as administrative and clerical, and Plaintiff also disputes this description. The application that Plaintiff submitted for the Records Examiner/Analyst position indicates that her educational background includes a high school diploma from the Lynn Vocational & Technical Institute, and approximately forty credit

---

[3] Whether or not this is the appropriate label for Plaintiff's clearance is disputed by Defendants.

hours in business management, paralegal studies, and travel and tourism courses from Bay State Junior College, North Shore Community College and Roger Williams University. Her previous employment includes work as a Legal Technician II and Records Examiner II for FSA's predecessors on the DEA contract, and as a senior claims processor for an insurance company.

In February 2005, Plaintiff was terminated by FSA, and her security clearance was revoked by the DEA. Plaintiff alleges that DEA revoked her security clearance, providing her with no explanation, no notice and no opportunity for a hearing, and that, as a consequence of this revocation, FSA was left no option but to terminate her because she no longer had the access necessary to perform her job. Plaintiff's claim that her termination was initiated by DEA, rather than by her employer FSA, is supported by the record. On February 4, 2005, Susan Ashcraft, DEA's Chief of Operations Management of the Asset Forfeiture Section, wrote to FSA's program manager in Landsdowne, Virginia, explaining that "Mrs. Baillargeon has Office of Professional Responsibility (OPR) issues and there are performance concerns related to her time and attendance," and requesting that she be terminated by FSA and removed "from the DEA office as soon as possible." The letter concludes, "Mrs. Baillargeon's DEA security clearance will be revoked immediately." On February 8, 2005, FSA's regional director Virgil Woolley wrote to Plaintiff:

> Forfeiture Support Associates (FSA) has been informed by the Drug Enforcement Administration (DEA) Headquarters Office of Chief Counsel that effective immediately your DEA security clearance will be revoked and you will be denied access to any DEA facility on the Department of Justice Asset Forfeiture Support Program contract. According to the DEA, this action is being taken based on performance concerns relating to your time and attendance. This letter formalizes the actions resulting from the DEA revoking your security clearance and barring of your access to the job site.

4

> As you are aware, being able to maintain a security clearance and access to the facility is a precondition of your employment. Accordingly, as a result of the loss of your clearance and access to the government facility to which you were assigned, you are unable to perform the duties and responsibilities of your position. Based on this, your employment with FSA will be terminated effective February 8, 2005.

Defendant DEA presents a more detailed and extensive version of the events surrounding Plaintiff's termination. While Plaintiff omits these details from her account, she does not dispute the significant aspects of Defendant's version. Defendant reports that it received an anonymous letter in 2004 alleging that Plaintiff was falsifying her weekly time cards. The DEA then undertook an investigation which revealed inconsistencies between the time Plaintiff claimed to be working and when she was actually in the office. The Warwick DEA office was outfitted with a perimeter alarm system which had to be disarmed by the first person to arrive in the morning, and turned back on by the last person out. The time for the alarm's activation and deactivation, and the identification code of the employee setting it, were recorded electronically. Plaintiff's time sheets showed that on some days she was at work before the alarm was turned off, and didn't leave until after the alarm was turned back on. DEA investigator Juliemarie Egan confronted Plaintiff with these discrepancies on January 27, 2005, and showed her a copy of the anonymous letter. According to Ms. Egan's report, Plaintiff was unable to account for the discrepancies between her time sheets and the alarm activation records on nine specific days. On four other days, Plaintiff was able to demonstrate that she was working on an assignment out of the office. Plaintiff was also unable to account for additional discrepancies concerning her lunch hours. After their meeting, Ms. Egan provided Plaintiff with an opportunity to consult her own records to see if she could account for any of the discrepancies. Plaintiff followed up with a

letter to Ms. Egan explaining in general terms that on some days she worked through lunch and left early; or recorded a lunch hour even when she didn't take one because she was instructed to do so; or left early on Friday afternoon because she was told to do so and not worry about her time. In addition, some weeks she worked more than forty hours and never received any overtime. Plaintiff explained that her supervisor was aware of these practices, which had been routine in her office for as long as she worked there.

DEA investigator Egan interviewed several of Plaintiff's co-workers, including her two immediate supervisors who were responsible for certifying her time records. They both said that they didn't notice when Plaintiff arrived or left for the day, and that she was frequently out of the office on business-related activities, and that they sometimes saw her in the office after five o'clock, although her scheduled hours were 8:30 to 5:00. Some other co-workers from the Boston regional office said it was sometimes hard to reach Plaintiff by phone, and that they found it easier to communicate with her via email. The office janitor said that he completed his duties no later than 8:30 each morning, and that he had only ever seen Plaintiff around ten times in two years.

On February 2, 2005, Plaintiff requested and was granted a two-week leave of absence. She then applied for temporary disability pay for "job related stress." A few days later she was terminated from her job, removed from the DEA office, and her security clearance revoked. Plaintiff collected temporary disability benefits until April 2006.

Plaintiff states that, since her termination, she has tried unsuccessfully to find another position in the field of asset forfeiture, or another clerical position with the U.S. government. In April 2006, she took a position working as a real estate assistant in an attorney's closing and title

office. From August 2008 to September 2009 when she was laid off, Plaintiff worked as office manager/paralegal/legal assistant with another attorney. Since then, she has been job-hunting, and taking paralegal courses at the Community College of Rhode Island. Defendant states that Plaintiff's post-DEA jobs have been similar to her Records Examiner/Analyst position with FSA in that they require clerical, administrative and paralegal skills. Plaintiff says the jobs are different.

ANALYSIS

Plaintiff's Claim

Plaintiff's sole surviving claim alleges that she was deprived of a constitutionally-protected liberty interest to pursue her chosen profession when her security clearance was revoked by Defendant with no procedural protections. Plaintiff's due process rights are established by the Fifth Amendment, and codified by the Administrative Procedures Act, 5 U.S.C. § 701 *et seq.*, that provides for judicial review of final actions taken by federal agencies, but limits Plaintiff's remedy to "relief other than money damages." 5 U.S.C. § 702.

A claim such as this one, that the government summarily interfered with one's protected liberty interest in pursuing a chosen profession, is most often brought in instances when the claimant alleges that a government actor has disseminated stigmatizing information about the claimant so that the claimant's ability to find another job in his or her chosen field is foreclosed. *See Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 573-74 (1972); *Burton v. Town of Littleton*, 426 F.3d 9, 14 (1st Cir. 2005). In fact, Baillargeon made such a claim in her First Amended Complaint, but it was dismissed by the Court on the DEA's motion because she failed to allege that Defendants had made intentional false statements about her, as the First Circuit has

7

required in *Burton* and *Wojcik v. Massachusetts State Lottery Com'n*, 300 F.3d 92, 103 (1st Cir. 2002). *Baillargeon v. Drug Enforcement Admin.*, 638 F.Supp.2d 235, 240 (D.R.I. 2009).

Another line of "chosen profession" cases examines alternative ways that the government can change one's status sufficiently to interfere with the liberty interest protected by the Constitution. Some of these cases include *Schware v. Board of Bar Examiners*, 353 U.S. 232 (1957) (plaintiff not permitted to sit for state bar exam); *Greene v. McElroy*, 360 U.S. 474 (1959) (revocation of aeronautical engineer's security clearance); *Kartseva v. Dep't of State*, 37 F.3d 1524 (D.C. Cir. 1994) (determination that plaintiff was ineligible to work as a Russian translator on State Department contract); and *Phillips v. Vandygriff*, 711 F.2d 1217 (5th Cir. 1983) (case remanded for hearing on plaintiff's claim that state commissioner's de facto licensing of savings and loan managers impinged his liberty).

The District Court for the District of Columbia has deftly characterized these two alternative lines of cases as:

> (1) a "reputation-plus" theory; or (2) a "stigma or disability" theory. Under the reputation-plus theory, Plaintiff must show an adverse employment action accompanied by "official defamation."
> Under the "stigma or disability" theory, Plaintiff must show an adverse employment action accompanied by "a stigma or other disability that foreclosed the plaintiff's freedom to take advantage of other employment opportunities." Unlike the "reputation-plus" theory, the "stigma or disability" theory "does not depend on official *speech*, but on" some "official *action*" that leads to a "continuing stigma or disability."

*Okpala v. District of Columbia*, __ F. Supp.2d __, 2011 WL 1297060, at *2 (D.D.C. 2011) (*quoting O'Donnell v. Barry*, 148 F.3d 1126, 1140 (D.C. Cir. 1998) and Bd. of Regents v. Roth, 408 U.S. 564, 573 (1972)). In Baillargeon's case, the "official action" is her termination and the "continuing stigma or disability" that allegedly impairs her ability to pursue her chosen

8

profession is the revocation of her DEA-sensitive security clearance.

### Security Clearance

Plaintiff's security clearance has served as a red herring in this case, and the parties' unabated focus on it has operated to confuse the legal issues before the Court. During the course of Plaintiff's employment, Defendants routinely referred to her clearance as a security clearance. Now, however, Defendant, DEA, argues that Plaintiff did not have a security clearance. Plaintiff maintains that she did. The parties' arguments reflect their efforts to place this case within the well-established legal history of cases involving government employees (or third-party contractors) working in the field of national security and defense, whose security clearances have been revoked. The Supreme Court has held that the grant of a security clearance in the context of national security is the exclusive domain of the executive branch, and that "no one has a 'right' to a security clearance." *Dep't of the Navy v. Egan*, 484 U.S. 518, 527-28 (1988). The generally-accepted analysis following *Egan* is that, "The ability to pursue such employment [i.e., employment requiring a security clearance] stands on precisely the same footing as the security clearance itself. If there is no protected interest in a security clearance, there is no liberty interest in employment requiring such clearance." *Dorfmont v. Brown*, 913 F.2d 1399, 1403 (9th Cir. 1990).

However, the same year the Supreme Court announced *Egan*, it also ruled that, while district courts lacked authority to review the merits of security clearance revocations, they could review colorable constitutional claims arising from these revocations. *Webster v. Doe*, 486 U.S. 592, 603-04 (1988). While Defendant herein urges the Court to follow the reasoning of *Dorfmont*, Plaintiff is no doubt interested in the level of procedural safeguards afforded

*Dorfmont*'s Plaintiff, which included two administrative hearings and two appeals, prior to her filing a federal lawsuit. Generally speaking, high-level employees working for government agencies in the areas of national security and defense are protected by a complex network of agency regulations, as illustrated, for example, in *Doe v. Cheney*, a case involving an employee of the National Security Agency:

> The Secretary of Defense has not, however, issued regulations under §§ 831-32 governing nonsummary dismissals. In fact, Directive 5210.45 states that when the conditions for summary removal under § 833 do not exist, the NSA Director "shall, when appropriate, take action pursuant to other provisions of law, as applicable, to terminate the employment of a civilian officer or employee." DoD Dir. 5210.45, § V-B, J.A. at 75.

885 F.2d 898, 905 (D.C. Cir. 1989) (footnote omitted). At any rate, the Court recognizes that Baillargeon did not have one of these high-level, top-secret security clearances that are central to the cases mentioned above. In its motion for summary judgment, Defendant asserts that Baillargeon had "DEA sensitive access" and "<u>did</u> <u>not</u> have a security clearance while she worked for FSA," regardless of how the clearance was initially characterized by Defendants' employees and agents. Ultimately, whether or not Plaintiff had a "security clearance" is not dispositive of Plaintiff's constitutional claim. Whatever it was that Plaintiff had – access or clearance – it was the thing that was conferred upon her by the government, that was necessary to perform her job, that, when revoked, rendered her unable to do her job. The revocation of the "DEA sensitive access" in this case operated as the "stigma or disability" that made it impossible for Plaintiff to continue in her job, just as the denial of a requisite license or certificate would in other circumstances.

Chosen Profession

The argument that is dispositive of this lawsuit is that Defendant's actions have not caused Plaintiff to be precluded from following her chosen profession, and therefore no constitutional violation has occurred. It is a central tenet of our democracy that "[i]t is undoubtedly the right of every citizen of the United States to follow any lawful calling, business, or profession he may choose, subject only to such restrictions as are imposed upon all persons of like age, sex, and condition." *Dent v. State of W. Va.*, 129 U.S. 114, 118 (1889). However, it is "the liberty to pursue a particular calling or occupation, and not the right to a specific job that is secured by the Fourteenth Amendment." *Habhab v. Hon*, 536 F.3d 963, 968 (8th Cir. 2008).

In applying this distinction, the Supreme Court has determined that a short-order cook who worked in the cafeteria of the Naval Gun Factory was "entirely free to obtain employment as a short-order cook or to get any other job" after her identification badge was summarily revoked by the commanding officer at the site. *Cafeteria & Rest. Wkrs. U., Local 473 v. McElroy*, 367 U.S. 886, 896 (1961). The Ninth Circuit has concluded that the discharged employee of the Federal Reserve Bank, a lawyer, could find other legal work, *Bollow v. Fed. Reserve Bank of San Francisco*, 650 F.2d 1093, 1101 (9th Cir. 1981); as could the discharged Chief Deputy of the Office of Alternate Public Defender, *Carleton v. County of L.A.*, 372 Fed. Appx. 806, 807 (9th Cir. 2010). In *Stretten v. Wadsworth Veterans Hospital*, the Ninth Circuit rejected the constitutional claim of a doctor discharged for incompetence, stating that the allegations against him, even if false, would result in "reduced economic returns and diminished prestige, but not permanent exclusion from, or protracted interruption of, gainful employment within the trade or profession." 537 F.2d 361, 366 (9th Cir. 1976). The Court of Appeals

explained:

> Liberty is not infringed by a label of incompetence, the repercussions of which primarily affect professional life, and which may well force the individual down one or more notches in the professional hierarchy.

*Id.* Similarly, a Michigan District Court, in dismissing the claim of a towing company that had lost its county contract, wrote:

> Accordingly, the loss of one's job and certain future opportunities does not constitute deprivation of a protected liberty interest. Indeed, it is only where the defendant's action effectively precludes the plaintiff from practicing his trade with all employers or customers that the plaintiff's liberty interest in pursuing his occupation is infringed.

*Wright v. Genesee Cnty. Corp.*, 659 F.Supp.2d 842, 850 (E.D. Mich. 2009) (internal quotation marks and citation omitted).

The revocation of Baillargeon's security clearance does not rise to the level of a constitutional violation of her liberty interest to pursue her chosen profession. While the revocation of her security clearance by DEA (and the resulting termination by FSA) may have been unfair, it was not illegal. Baillargeon's educational background and employment history indicate that she is prepared to work in a clerical or administrative capacity. That is the nature of the work that she did for FSA, and that is the type of work that she has been able to find since her termination. Her two subsequent jobs as a real estate assistant and an office manager demonstrate that she has not been foreclosed from pursuing work in her chosen field. While she may have preferred asset forfeiture work, as an at-will employee, she has no legal right to retain that position. Accordingly, the Court grants summary judgment in favor of Defendant.

## CONCLUSION

For the reasons stated above, the Court grants Defendant's motion for summary judgment on Count I, the remaining count of Plaintiff's First Amended Complaint, and denies Plaintiff's motion for partial summary judgment on the same count.

The Clerk shall enter judgment as indicated forthwith.

IT IS SO ORDERED.

/s/ John J. McConnell, Jr.
John J. McConnell, Jr.
United States District Judge
July 19, 2011